Ellen V. Leonida, Esq.
  leonida@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, Tenth Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

*Counsel for Defendant, Charles Richard Barrett*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>CHARLES RICHARD BARRETT,<br><br>    Defendant. | Case No. 3:22-cr-00152-SI<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>Date:   July 28, 2023<br>Time:   11:30 A.M.<br>Judge:  Hon. Susan Illston<br>        Courtroom 01, 17th Floor |

## INTRODUCTION

Charles Barrett grew up in a family and community that constantly reinforced the idea that homosexuality was "evil" and "disgusting." Despite this, and despite a childhood spent taking care of a mentally ill mother and a younger sister, Mr. Barrett excelled in school, started working at 14, and eventually put himself through college. He still struggled with his sexuality and the negative reinforcement he had grown up with, however. In his early twenties, he entered into an abusive relationship, then escaped it to find himself ashamed, confused, and turning to dating apps. It was during this dark period of his life that he committed the offense that brings him before this Court for sentencing—a decade ago, Mr. Barrett met two young men on an adult dating app and, despite learning that they were 16, exchanged nude photographs with them. Mr. Barrett has never before, or since, been convicted of any crime and deeply regrets his conduct. A sentence of five years imprisonment is more than sufficient to punish Mr. Barrett.

## BACKGROUND

After fleeing from his abusive biological father, Charles Barrett and his mother spent his childhood moving around the country with his stepfather, eventually settling in Fresno, California, when Mr. Barrett was near the end of elementary school. Leonida Decl. ¶ 3, Ex. B, Letter from Sally and Thomas George. By the time they settled in Fresno, Mr. Barrett had spent his childhood away from family and had never lived anywhere long enough to make friends. *Id.*

Although his mother and step-father loved him, they raised him in a deeply religious community, where pastors routinely called gay people "evil, sick, and disturbed." *Id.* Mr. Barrett, who has known he was gay since he was five years old, "would sit quietly, while feeling a great sense of shame, and pray that he not be gay anymore." *Id.*; *see also* Leonida Decl. ¶ 2, Ex. A, Letter from Charles Barrett ("These ideas were reinforced by seemingly everyone around me, even people who were kind and compassionate in every other situation would cringe at the thought of someone being gay."); Leonida Decl. ¶ 4, Ex. C, Letter from Bethan Rubalcava ("we were raised in a baptist church with a father who wasn't shy about his negative opinions on the gay community and in a town that shared those same negative opinions.") He did not come out to his family until he was in his twenties. Leonida Decl., Ex. B.

In addition to the burden of having to hide his true self from everyone in his life, Mr. Barrett found himself tasked with taking care of his younger siblings after his mother began to suffer from "manic depression, schizophrenia, and chronic migraines." *Id.* His mother explains:

> During this time I also began to engage in self harm by cutting my own wrists in an attempt to relieve my pain. At times he would have to wrestle knives away from me and help tend to self-inflicted wounds. He would take care of me, tell me he loved me, and support me along with caring for his younger siblings.

*Id.* Mr. Barrett came home more than once to see his mother clutching a knife and bleeding from her wrists. Leonida Decl., Ex. A. His younger sister describes a childhood of "making [their mother's] meals, consoling her as she sobbed, hiding knives/scissors where they couldn't be found, physically restraining her from banging her head against the wall, and frequent ER visits when our attempts failed." Leonida Decl., Ex. C. Throughout it all, Mr. Barrett took care of his little sister, as well as his mother. *Id.*

Despite these obstacles, Mr. Barrett excelled at school and started working at 14 years old, often at two jobs. Leonida Decl., Ex. B. He made friends and worked his way to the top of the marching band. Leonida Decl., Ex. C. He put himself through college, then a Master's program, earning a degree in music. Leonida Decl., Ex. B.

Although Mr. Barrett was pursuing his dreams of making music and working in the music field, he still struggled with his sexuality. He had no idea how to meet other gay people and turned to on-line dating. He found himself in an abusive relationship, cut off from friends and family. When he finally gathered the strength to leave, he turned to on-line dating again. Leonida Decl., Ex. A.

By that time, Mr. Barrett writes, "I was in my mid twenties, had no idea who I was, or how to be in a healthy relationship." He was struggling to find work in his field and had almost died from a ruptured appendix. *Id.*; Leonida Decl., Ex. B. It was "during this dark period of [his] life" that Mr. Barrett committed this offense. Leonida Decl., Ex. A. Mr. Barrett met a man on a dating app that required its users to be at least 18 years old. PSR ¶ 34; Dkt. 57, ¶ 2. Although Mr. Barrett learned that he was actually 16, they exchanged nude photographs of each other. *Id.* This exchange, like their entire relationship, was consensual. *Id.* The other man, now in his mid-twenties, did not

report a crime or consider himself a victim of Mr. Barrett. PSR ¶ 28. The photographs he sent form the basis of the charge to which Mr. Barrett pled guilty.

Mr. Barrett takes full responsibility for the crime he committed. In his words: "Regardless of the outcome of these proceedings I am committed to making amends with my community and will spend the remainder of my life working to restore and repair the damage I have caused." Leonida Decl., Ex. A. His family attests to the sincerity of his remorse. Leonida Decl., Exs. B-C; Leonida Decl. ¶ 5, Ex. D, Letter from Daniel Chastain; Leonida Decl. ¶ 6, Ex. E, Letter from Lucrecia Ugarte.

In the decade since this exchange, Mr. Barrett continued to work and to pursue his musical career. He got a job at The Cathedral School in San Francisco. His relationship with Mr. Nunez, his first healthy romantic relationship, gave him the support to come out to his family. Leonida Decl., Ex. B. Lucrecia Ugarte, Mr. Barrett's friend and (now) custodian, met him ten years ago and describes his presence in her life as a "godsend." Leonida Decl., Ex. E. He has been supportive, caring, and a "true asset in any situation or environment." *Id.*

On June 18, 2020, HIS agents executed a warrant for Mr. Nunez and his electronic devices at the home he and Mr. Barrett shared. The warrant was based on probable cause to believe that Mr. Nunez possessed child pornography. The investigation never mentioned Mr. Barrett and he has not been implicated in it. When questioned by law enforcement, Mr. Nunez also confirmed that Mr. Barrett had no involvement and that he had never spoken to Mr. Barrett about child pornography and they had never discussed anything connected to his offense. PSR ¶¶ 9-13.

Despite Mr. Barrett not being implicated in the offense the officers were investigating, they seized his electronic devices. They did not search those devices for over a year. When they did, they found the images that form the basis of this Indictment.

Mr. Barrett was arrested and taken to the Santa Rita County Jail. There, being gay was a constant safety risk. During his transportation to and incarceration at the Santa Rita County Jail, he heard law enforcement personnel referring to "groomers" and "faggots" and the person in the cell next to his repeatedly screaming profanities, including, "mother fucking faggots, I'll fuck you up." Mr. Barrett was perpetually in fear that people at the jail would find out that he was gay. Although

Mr. Barrett was confined to his cell during his six days at Santa Rita, his cellmate repeatedly asked what he was charged with. His arrest was public so he also feared that other detainees would find out about his crime. Mr. Barrett's mental health was so severely impacted that he was barely able to eat and had trouble using the toilet. Dkt. 55, ¶ 6.

In addition to the terrifying time Mr. Barrett spent at the Santa Rita jail, he lost his career and professional relationships. Leonida Decl., Ex. A. He found himself "[a]s a result of my actions… once again, [living] with the shame of what others will think of me." *Id.*

When he was released from custody, Mr. Barrett was sent to live with his parents in Fresno. He had lost his job and could only spend a few hours at a time with his fiancé. Leonida Decl., Ex. B. Although his family was deeply concerned about his mental health during this period, Mr. Barrett persevered. *Id.* He cared for his mother and spent time with his grandparents, doing chores and cooking for them. *Id.*

Mr. Barrett also began therapy for his anxiety and depression and started to work through his childhood trauma. *Id.* Today, he is not "the person that made the terrible choices that resulted in my arrest." Leonida Decl., Ex A. Mr. Barrett has, once again, rebuilt his life. He is working hard in therapy to address his childhood trauma and ongoing anxiety, depression, and ADHD. *Id.*; Leonida Decl., Ex. B.

Despite losing the career he had dreamed of since childhood, Mr. Barrett regrouped, got a job at Audi, and has been working there ever since, quickly rising through the ranks due to his work ethic and excellent service. Leonida Decl., Ex. B. He is proud of his new career path and the fact that he has turned his dealership into the top location in the country. Leonida Decl., Exs. A-B.

Mr. Barrett's family and friends have submitted multiple, moving testaments to his character, his charitable nature, and his resilience in the face of adversity. Leonida Decl., Exs. B-E; Leonida Decl. ¶ 7, Ex. F, Letter from Cheyanne Lillie-Boyle. Daniel Chastain describes him as "a fierce friend and an incredible person" who is "hard working, smart, and talented." Leonida Decl., Ex. D. Ms. Ugarte emotionally describes how Mr. Barrett saved her from a suicide attempt. Leonida Decl., Ex. E. She has seen his reliance first-hand and is confident that he can come out of this period of his life smarter and stronger. *Id.*

**OBJECTIONS TO PSR**

**Paragraphs 15:** The PSR repeats lengthy conversations about sex between Mr. Barrett and his now-husband. These conversations have nothing to do with any illegal conduct, and have no bearing on this case. While probation asserts that these conversations are included because they reflect on Mr. Barrett's character, they do not; they only speak to the nature of his sexual relationship with his husband.

**Paragraphs 14, 16:** The PSR incorrectly and inappropriately implies that photographs of Mr. Barrett with children are somehow related to these charges. There is no evidence whatsoever that this is true. In fact, one photograph is captioned "First day subbing Tuesday look." Defense counsel asked probation to produce any photographs of Mr. Barrett with children that appeared inappropriate. Probation failed to do so.

**Paragraph 31**: The PSR asserts, for the first time, the government's contention that Mr. Barrett obstructed justice in relation to this case.[1] Mr. Barrett was not given the opportunity to object to the probation officer's late-asserted claim that Barrett obstructed justice. He did not. The behavior the government is now calling obstruction of justice occurred during the arrest of Mr. Barrett's husband for unrelated charges.

**DISCUSSION**

The proposed sentence of five years imprisonment is sufficient to punish Mr. Barrett for this decade-old crime. In determining an appropriate sentence, the Court must look to the factors set forth in 18 U.S.C. § 3553, among them the applicable Sentencing Guideline calculation. *United States v. Booker*, 543 U.S. 220, 245-46 (2005); *United States v. Autery*, 555 F.3d 864, 872 (9th Cir. 2009); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). While the Court must remain mindful of the Sentencing Guideline recommendation, that is only one of the applicable factors; the Guideline range is not presumptively reasonable and it cannot be given any more or less weight than any other factor listed in section 3553(a). *Autery*, 555 F.3d at 872; *Carty*, 520 F.3d at 988, 991. The Court's paramount concern must be to impose a sentence "sufficient, but not greater than

---

[1] The draft PSR stated that "The probation officer has no information indicating the defendant impeded or obstructed justice."

necessary" to "reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *Carty*, 520 F.3d at 991. In this case, a sentence of five years is more than sufficient to achieve the goals of sentencing.

### I.  MR. BARRETT'S HISTORY AND CHARACTERISTICS AND THE NATURE AND CIRCUMSTANCES OF THE OFFENSE WARRANT IMPOSITION OF THE MANDATORY MINIMUM TERM OF FIVE YEARS (18 U.S.C. § 3553(A)(1))

Mr. Barrett has no criminal history and has contributed to society in a positive way throughout his life. He took care of his severely psychologically disabled mother, as well as his younger sister—all while hiding his sexuality from a family and community who openly condemned it. Mr. Barrett's sister writes that, "To think that Charlie went through all those same familial struggles while feeling forced to hide this huge part of his life just breaks my heart; but it also shows to prove his resilience." Leonida Decl., Ex. C.

Notwithstanding these obstacles, Mr. Barrett went on to live an exemplary life, graduating from college, then graduate school. He has been employed his entire adult life, including during his period of pre-trial supervision. PSR ¶¶ 86-92; Leonida Decl., Ex B. The attached letters from his family and friends attest to his character and his positive contributions to his community. Leonida Decl., Exs. B-F. Mr. Barrett's history and characteristics thus warrant a variance from the advisory Guidelines.

The nature of the offense also warrants a variance from the advisory Guidelines. The circumstances of this case, which occurred a decade ago, consist of the consensual exchange of nude selfies between Mr. Barrett, then in his early 20s, and two men who were in their late teens. Mr. Barrett committed this offense during a particularly difficult period in his life and fully understands the gravity of his crime. Leonida Decl., Ex. A ("I never intended to cause any harm but ignorance is not a justification for my actions. I now know how my actions and choices were wrong, I deeply regret what I did and will never make the same mistake again.").

## II. IMPOSITION OF THE MANDATORY MINIMUM SENTENCE OF FIVE YEARS WOULD ACHIEVE THE GOALS OF RETRIBUTION, DETERRENCE, INCAPACITATION, AND REHABILITATION (18 U.S.C. § 3553(A)(1))

Section 3553(a)(2)(A) requires the Court to consider the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Section 3553 further requires the Court to consider whether the proposed sentence would "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B), (C). Finally, the Court is instructed to craft a sentence that will "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." 18 U.S.C. § 3553(a)(2)(D). A sentence of five years imprisonment would achieve all these goals.

Aside from the consensually exchanged photographs that form the basis of this case, there was no other alleged child pornography found on any of Mr. Barrett's devices. Mr. Barrett deeply regrets this conduct, which he engaged in during a difficult period in his life and which has not recurred since. Mr. Barrett has no criminal history and has not been accused of any criminal conduct in the decade since these selfies were exchanged. Incarceration is not necessary to protect the community from him.

In light of Mr. Barrett's background, including the ten years he spent living a productive, crime-free life after committing these offenses, none of the goals of sentencing would be served by the imposition of more than the mandatory minimum sentence in this case. Mr. Barrett's time in the Santa Rita jail was traumatic and terrifying. He has never spent time in jail before and the threats and fear he experienced at that facility will haunt him forever. More than five additional years of incarceration is not necessary to punish or deter him. Nor is a lengthy sentence necessary for general deterrence, which studies have repeatedly shown is not served by the imposition of lengthy prison sentences. *Five Things About Deterrence*, National Institute of Justice, May 2016, NCJ 247350, https://www.ojp.gov/pdffiles1/nij/247350.pdf. Finally, as he explains in his letter, this arrest led Mr. Barrett to engage in therapy and come to terms with many of the traumatic events in his background and the impact they continue to have on him. He is thus engaged in precisely the type of rehabilitation that will serve both him and his community going forward.

### III. A VARIANCE FROM THE SENTENCING GUIDELINES RECOMMENDATION IS WARRANTED IN LIGHT OF THE UNIQUE CIRCUMSTANCES OF THIS CASE 18 U.S.C. § 3553(A)

Probation advocates for the application of the Guidelines applicable to production of child pornography, which result in an offense level of 32. Although these Guidelines are, perhaps, technically applicable, doing so would result in a gross miscarriage of justice. Mr. Barrett's ten-year-old, consensual exchange of nude photographs with two young men in their late teens, both of whom he met on a dating app, is not comparable to the victimization of young children that is normally associated with the production of child pornography. Neither of the men, now in their mid-twenties, has described feeling victimized, traumatized, or otherwise hurt by their involvement with Mr. Barrett in 2013. Punishing him on the same scale as a producer of child pornography would be a miscarriage of justice.

### CONCLUSION

Ten years ago, Mr. Barrett committed an offense for which he is deeply remorseful. Before, and after, that dark period of his life he has been a hard worker, a caretaker to friends and family, and light in the lives of people close to him. A mandatory minimum sentence of five years in prison would be more than sufficient to punish him for this offense.

Dated: July 21, 2023                                                            Respectfully submitted,

*/s/ Ellen V. Leonida*
ELLEN V. LEONIDA
BraunHagey & Borden LLP

*Counsel for Defendant,*
*Charles Richard Barrett*